# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

5677 Earnings Drive
Columbus, OH 43232

)
)
)
)
)

Case No. 19 mj 816

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment C

located in the _____ Southern _____ District of _____ Ohio _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment D

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 26 U.S.C. § 7201 | Attempt to Evade or Defeat the Assessment of Tax |

The application is based on these facts:

See Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

David J. Gosiewski Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 10/11/2019

City and state: Columbus, Ohio

*Judge's signature*

N. m. King, USbm Judy
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN THE MATTER OF THE SEARCH OF:

2770 Brice Road, Reynoldsburg, OH 43068

5658 Matuka Drive, Columbus, OH 43232

5677 Earnings Drive, Columbus, OH 43232

Case No. _____

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, David J. Gosiewski, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the following premises:

a. 2770 Brice Road, Reynoldsburg, OH 43068 (Asian Star Buffet; Attachment A);

b. 5658 Matuka Drive, Columbus, OH 43232 (Chauling Yueng residence; Attachment B);

c. 5677 Earnings Drive, Columbus, OH 43232 (Jin Peng residence; Attachment C);

collectively referred to as the "PREMISES," for the things described in Attachment D.

2.      I am a Special Agent with the Criminal Investigation Division of the Internal Revenue Service (IRS), United States Department of the Treasury, and have been so employed since May of 2005.  I have a Bachelor's degree in Accounting, with a minor in

Criminology.  I have received extensive training in financial investigative techniques.  I have personally conducted and/or participated in numerous investigations of persons and business organizations that have violated Federal statutes, particularly those statutes found in Title 26 and Title 18 of the United States Code.  I was assigned to the Cincinnati Field Office in December 2005, subsequent to completing the required Special Agent training at the Federal Law Enforcement Training Center in Glynco, Georgia.  My training included lessons in financial investigative techniques, accounting, tax, criminal investigation techniques, criminal law, and search warrants.  Prior to May 2005, I was employed as a Special Agent Student Trainee with Internal Revenue Service-Criminal Investigation Division for approximately one year beginning in July 2004.

3.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 26 U.S.C. §§ 7201 – Attempt to Evade or Defeat the Assessment of Tax; 7206(1) – Subscribing to a False Tax Return; 7202 – Willful Failure to Collect or Pay Employment Tax; 7206(2) – Aiding or Assisting in the Preparation of a False Tax Return; as well as violations of 18 U.S.C. §§ 371 – Klein Conspiracy; 892 – Making extortionate extensions of credit; 1956(h) – Money Laundering Conspiracy; 1589 - Forced Labor; and 1590 Trafficking with respect to peonage, slavery, involuntary servitude, or forced labor have been committed by Chio

2

Chan, Chauling Yueng, Yik Mui Chan, Jin Ping Chan and/or others. Furthermore, there is also probable cause to search the PREMISES, for the fruits, instrumentalities, and evidence of this crime as described in Attachment D.

## BACKGROUND

5.     Since approximately September of 2018, I have been involved in the investigation of Chio Chan (Chan), his associates, and a related business, the Asian Star Buffet ("Asian Star") located at 2770 Brice Road in Reynoldsburg, Ohio. The business was previously operated by  Asian Star of Reynoldsburg, Inc. and is currently operated by Asian Star 88 LLC.

6.     Chan's associates include Chauling Yueng (Yeung), Yik Mui Chan (Yik), and Jin Ping Chan (Jin). Information acquired during the investigation indicates that Jin is Chan's previous spouse, Yik is Chan's current girlfriend/spouse, and Yueng is Yik's daughter/Chan's step-daughter. Yik presented a Chinese passport as her means of identification, which indicates that Yik is not a citizen of the United States. Yeung is 30 years old.  Chauling Yueng is currently married to Chunlin Wu.

7.     IRS records show that Asian Star of Reynoldsburg Inc. began operating on April 14, 2003.  Jin was listed as the sole shareholder on corporate tax returns filed for the 2010 through 2015 tax years. An open source news article in 2009 discussing a health code violation reported that Chio Chan is the owner. IRS records show that Asian Star 88 LLC with a new Employer Identification Number (EIN) was formed January 1, 2015, and began doing business as Asian Star Buffet at the same location on Brice Road.  Yeung was listed as the sole shareholder on corporate tax returns filed for the

3

2015 through 2017 tax years. In 2017 Chan also gave an interview to FBI agents in New York in which he stated his girlfriend, Yik Mui Chan, owned the Asian Star Buffet. Chan also claimed in the interview that he was employed by Xan Xin, a Dollar Store distributor, and made approximately $350 per week. Chan did not claim he worked at the Asian Star Buffet.

8. Although Chan's residence listed on his 2019 Ohio driver's license is the address for the Asian Star Buffet in Ohio, Chan has been living in the Sands Casino in Bethlehem, Pennsylvania for the past few years due his status as a significant patron to the casino; it appears that Yik resides with Chan at the Sands Casino. From approximately 2013 through 2018, Chan bought in to casino games with approximately $5.6 million in cash and $17.7 million on credit. Chan has approximately $4.4 million in gambling losses over these years. Chan's current gambling activity for 2019 consists of $1.1 million in cash buy-ins, $794,595 in chip buy-ins and $7.6 million in credit buy-ins. Evidence gathered in this investigation indicates Chan is likely earning income from his involvement in extending extortionate lines of credit.

## TAX INFORMATION - ASIAN STAR

9. IRS databases show that Asian Star of Reynoldsburg, Inc. filed Forms 1120 for the 2010 through 2014 tax years using a fiscal years ending March 31st. (an extension was filed for the 2012 tax year but the return was never filed); the 2014 tax return was marked as the Final return. The returns stated that Jin Ping was the sole shareholder of the corporation, and the returns were prepared by Mui and Associates

4

out of New York, NY. Below is a summary of the corporate returns filed with the IRS:

| Tax Year | 2013 | 2014 |
|---|---|---|
| Gross Receipts | $1,202,628.00 | $1,004,905.00 |
| Less Cost of Goods Sold | $770,425.00 | $647,863.00 |
| Less: Gain or Loss from 4797 | $0.00 | -$153,900.00 |
| Equals: Gross Profit | $432,203.00 | $203,142.00 |
| Less: Total Deductions | $433,490.00 | $319,706.00 |
| Equals: Taxable Income | -$1,287.00 | -$116,564.00 |

10.　　Bank records obtained from JP Morgan Chase for January 2014 through March 2016 for the operating account(s) of Asian Star of Reynoldsburg Inc. show that not one cash deposit was made to the account(s) during this time frame. The signers on the account are Jin Ping Chan, Chauling Yueng and Chio Chan.

11.　　Asian Star's federal employment tax returns generally reported minimal wages for several employees. Below is a summary of Forms W-2 issued by Asian Star of Reynoldsburg Inc. to employees for their wages and federal income tax withholding (FITW):

**2012**

| NAME | SSN | TIPS | GROSS WAGES | FITW |
|---|---|---|---|---|
| Chio Luen Chan | 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 | 0 | 9,600 | 0 |
| Jin Ping Chan | 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 | 11,748 | 18,948 | 324 |
| Hu Qing Chen | 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 | 11,236 | 18,436 | 666 |
| Feng Yan Huang | 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 | 0 | 36,000 | 2,175 |
| Xiang Cheng Lin | 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 | 14,489 | 24,089 | 838 |
| Lan Ying Liu | 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 | 0 | 8,005 | 402 |

5

| | | | | |
|---|---|---|---|---|
| Chang Wu Chen | 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 | 3,785 | 6,185 | 226 |
| Kai Shun Wong | 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 | 11,855 | 20,255 | 455 |
| Shao Kan Chen | 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 | 0 | 18,000 | 230 |
| Yue Xiang Li | 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 | 0 | 8,000 | 0 |
| Kam Mui Wong | 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 | 0 | 6,000 | 0 |
| Chio Luen Chan | 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 | 0 | 5,600 | 0 |
| Lan Ying Liu | 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 | 0 | 12,005 | 0 |

Total wages = $191,123

**2013**

| NAME | SSN | TIPS | GROSS WAGES | FITW |
|---|---|---|---|---|
| Chau Ling Yeung | 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 | 12,585 | 19,785 | 2,287 |
| Chio Luen Chan | 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 | 5,431 | 9,931 | 662 |
| Jin Ping Chan | 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 | 8,392 | 13,192 | 0 |
| Xiang Cheng Lin | 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 | 8,082 | 12,882 | 0 |
| Lan Ying Liu | 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 | 0 | 14,400 | 219 |
| Ju Lian | 112-968-7767 | 11,369 | 20,369 | 244 |
| Kai Shun Wong | 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 | 0 | 10,500 | 0 |
| Yue Xiang Li | 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 | 5,689 | 8,659 | 0 |
| Tony Yang | 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 | 0 | 20,400 | 2,283 |
| Hui Yu | 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 | 0 | 20,760 | 2,337 |
| Kam Mui Wong | 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 | 3,664 | 6,064 | 0 |

Total wages = $156,942

**2014**

| NAME | SSN | TIPS | GROSS WAGES | FITW |
|---|---|---|---|---|
| Chau L Yeung | 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 | 5,974 | 17,329 | 1,356 |
| Chio L Chan | 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 | 4,768 | 10,168 | 220 |
| Jin P Chan | 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 | 6,562 | 11,162 | 193 |
| Yun C Huang | 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 | 0 | 27,000 | 666 |
| X C Lin | 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 | 2,420 | 4,020 | 0 |
| Lan Y Liu | 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 | 1,152 | 8,352 | 66 |
| K S Wong | 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 | 0 | 10,000 | 0 |
| Chaoqun Tang | 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 | 4,937 | 10,127 | 479 |
| H Yu | 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 | 0 | 21,895 | 387 |
| Yi w Feng | 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 | 0 | 7,200 | 196 |
| Kam M Wong | 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 | 3,840 | 6,340 | 0 |

Total wages = $133,593

12. Asian Star 88 LLC's corporate tax returns were prepared by Dorcas

Accounting out of New York, NY. Below is a summary of the 2015 through 2017 tax returns filed with the IRS for Asian Star 88 LLC:

| Tax Year | 2015 | 2016 | 2017 |
|---|---|---|---|
| Gross Receipts | $1,253,117.00 | $1,269,838.00 | $1,250,838.00 |
| Less Cost of Goods Sold | $765,701.00 | $929,220.00 | $797,937.00 |
| Less: Gain or Loss from 4797 | $0.00 | $0.00 | $0.00 |
| Equals: Gross Profit | $487,416.00 | $340,618.00 | $452,901.00 |
| Less: Total Deductions | $490,387.00 | $338,651.00 | $450,947.00 |
| Equals: Taxable Income | -$2,971.00 | $1,967.00 | $1,954.00 |

13.     Bank records obtained from US Bank for April 2016 through April 2017 and from JP Morgan Chase from January 2015 through May 2016 for the operating account(s) of Asian Star 88 LLC show that not one cash deposit was made to the account. The only deposits to the account were from the restaurant's credit card payment processor(s). The fact that no cash deposits were made into the operating account(s) would suggest one of two things: that the restaurant does not accept cash; and/or the restaurant is not reporting cash receipts on its tax returns.

14.     In February of 2019, your affiant was a customer at Asian Star during business hours and paid cash for his meal. Your affiant also witnessed other patrons pay for their meals in cash. Each time, the affiant observed Chauling Yueng behind the cash register take the cash and place it inside the cash register without generating any kind of paper receipt. Based on my training and experience, a business such as a restaurant that accepts cash yet shows no cash deposits in the bank records is likely underreporting its gross receipts and/or paying employees in cash without accurately

7

accounting for the payments.

15.    Asian Star 88 LLC's federal employment tax returns generally show minimal wages for several employees, and the Forms 940 and 941 are signed and prepared by Chauling Yueng.  Asian Star 88 LLC's federal employment tax returns generally show minimal wages for several employees. Below is a summary of Forms W-2 issued by Asian Star 88 LLC to employees for their wages and federal income tax withholding (FITW):

**2015**

| NAME | SSN | TIPS | GROSS WAGES | FITW |
|---|---|---|---|---|
| Yi X Chen | 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 | 8,874 | 12,494 | 0 |
| Chioluen Chan | 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 | 0 | 6,002 | 0 |
| Jin P Chan | 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 | 6,106 | 9,271 | 0 |
| Sisheng Sun | 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 | 8,361 | 13,135 | 0 |
| Lanying Liu | 101-0-4807 | 0 | 4,033 | 0 |
| X L Chen | 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 | 0 | 9,015 | 0 |
| Qin L Chen | 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 | 0 | 9,015 | 0 |
| Mu J Zhuang | 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 | 6,313 | 9,909 | 0 |
| To Yeung | 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 | 0 | 5,996 | 0 |
| J Q Lu | 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 | 0 | 4,033 | 0 |
| Lanying Liu | 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 | 0 | 0 | 0 |
| Jin Q Lu | 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 | 0 | 4,033 | 0 |
| Lanying Liu | 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 | 0 | 0 | 0 |
| Total wages = $86,936 | | | | |

**2016**

| NAME | SSN | TIPS | GROSS WAGES | FITW |
|---|---|---|---|---|
| Chauling Yeung | 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 | 0 | 30,898 | 0 |
| Yi X Chen | 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 | 8,594 | 15,142 | 0 |
| Chioluen Chan | 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 | 0 | 6,080 | 0 |
| Jin P Chan | 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 | 5,292 | 9,070 | 0 |
| Melkan Mekonen | 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 | 0 | 700 | 0 |
| Mu J Zhuang | 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 | 7,210 | 12,525 | 0 |
| Jia Chen | 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 | 0 | 12,561 | 0 |
| To Yeung | 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 | 0 | 15,740 | 0 |
| Chunlin Wu | 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 | 0 | 3,978 | 0 |
| Total Wages = $106,694 | | | | |

**2017**

| NAME | SSN | TIPS | GROSS WAGES | FITW |
|---|---|---|---|---|
| Chauling Yeung | 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 | 0 | 31,968 | 0 |
| Chioluen Chan | 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 | 0 | 20,160 | 0 |
| Jin P Chan | 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 | 3,262 | 6,460 | 0 |
| Y D Yu | 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 | 0 | 15,120 | 0 |
| Melkan Mekonen | 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 | 0 | 1,405 | 0 |

| Jia Chen | 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 | 0 | 5,040 | 0 |
| To Yeung | 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 | 0 | 14,112 | 0 |
| C Wu | 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 | 0 | 31,968 | 0 |
| Total wages = $126,233 | | | | |

**2018**

| NAME | SSN | TIPS | GROSS WAGES | FITW |
|------|-----|------|-------------|------|
| Chauling Yeung | 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 | 0 | 34,944 | 963 |
| Chioluen Chan | 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 | 0 | 20,160 | 0 |
| Jin P Chan | 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 | 1,607 | 2,752 | 0 |
| Melkan Mekonen | 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 | 0 | 6,892 | 0 |
| Yinghua Kong | 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 | 1,272 | 2,997 | 0 |
| Chun Q Huang | 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 | 9,483 | 13,118 | 0 |
| To Yeung | 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 | 0 | 12,096 | 0 |
| Chunlin Wu | 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 | 0 | 34,944 | 0 |
| Total wages = $127,903 | | | | |

16.     Surveillance in 2018 and 2019 observed at least eleven (11) workers that appeared to be primarily of Asian descent being driven to the restaurant from the residence at 5677 Earnings Drive, Columbus, OH and driven back to the home in a cargo van that does not even have rear seats. Public records show that two story, single-family residence is in the name of Chan's former spouse Jin Ping.

17.     Surveillance of the Asian Star Buffet located at 2770 Brice Road, Reynoldsburg, OH on June 7, 2018 showed the following:

a   At approximately 9:18PM, a black BMW X3 SUV registered to Chauling Yueng (OH plate FWW8623) arrived at the Asian Star Buffet and parked on a front parking spot near the front door, beside a white, Ford cargo van registered to Yueng (OH plate GGZ7591.)  An Asian male wearing a hat was driving the vehicle and went inside.

b   At approximately 10:08PM, an Asian woman wearing pink shirt entered

10

the driver's side of the BMW X3, and another Asian woman wearing a black shirt exited behind her carrying a large, white plastic bag that was lumpy at the bottom. This female carrying the bag placed the bag in the rear passenger compartment and then entered the passenger's seat. The X3 left and exited toward Brice Road.

c   The agents followed the X3 to 5677 Earnings Drive where it parked in the street, and the passenger exited the vehicle and went inside the residence, not carrying the white, plastic bag. A black BMW 5-series (OH plate GHV9259) was parked in the driveway. A white Acura sedan registered to Jin Ping's daughter, Angel Lin, (OH plate GQT5882) was parked in the street. The X3 then drove on to 5658 Matuka Drive where it parked in the driveway, and the female driver in the pink shirt exited and retrieved the large, white plastic bag from the rear passenger seat and entered the residence.

d   At approximately 10:20PM, the white, Ford cargo van previously seen at the Asian Star Buffet arrived at 5677 Earnings Drive and parked in the driveway. At least 10, possibly 12 individuals dressed in black shirts and black pants exited the cargo van all and went inside the residence. The individuals were packed in the van, and the van was observed as not having any seats or seatbelts in the rear of the van.

e   At approximately 10:35PM, an Asian male exited 5677 Earnings Drive with a white, plastic bag and walked to 5658 Matuka Drive and went inside the residence.

11

f   Surveillance of the Asian Star Buffet located at 2770 Brice Road, Reynoldsburg, OH on January 7, 2019 showed the following:

g   At approximately 21:05, a black BMW X-3 registered to Chauling Yueng, license plate # FWW 8623, left the Asian Star Buffet parking lot located at 2770 Brice Road, Columbus, OH and headed north on Brice Road. At 21:20, the BMW X-3 was spotted in the driveway of 5658 Matuka Drive, Columbus, OH.

h   At approximately 21:20, a white van registered to Chauling Yueng, license plate # GGZ 7591, left 5677 Earnings Drive. The white van arrived at the Asian Star Buffet at approximately 21:28. Upon arrival, an Asian male dressed in a dark gray sweatshirt and light gray sweatpants exited the driver's side of the vehicle and entered the restaurant.

i   At approximately 21:55, 11 individuals exited the Asian Star Buffet and entered the white van. One of the individuals, dressed in all black and different from the person who had previously exited the driver's side of the white van, entered the driver's side of the van. The van then left the parking lot and headed west on Brice Road. At approximately 22:00, the van arrived at 5677 Earnings Drive, Columbus, OH. All individuals exited the van and entered the residence.

j   At approximately 22:05, the black BMW X-3, which had been parked in the driveway at 5658 Matuka Drive, Columbus, OH, backed up, pulled into the garage, immediately backed out of the garage and parked. Two individuals, at least one of which was male, exited the vehicle and entered

12

the residence. The garage door was then closed.

18. Surveillance on January 9, 2019 showed that at approximately 10:04PM, 11 individuals packed in the white Ford cargo van, license plate # GGZ 7591 from the Asian Star Buffet and proceeded to drive to 5677 Earnings Drive and parked in the driveway. At approximately 10:12PM, 10 of the 11 individuals went inside the front door, and the driver cut through the backyard and entered the front door of 5658 Matuka Drive. Surveillance on October 8, 2019 showed Chauling Yueng exiting the Asian Star Buffet in the BMW X3 and leaving the premises around 9:40PM.

19. Payroll tax records for Asian Star 88 LLC obtained from the State of Ohio Department of Taxation are consistent with the Forms W-2 filed by the business, and show the following number of employees and wages reported for the years 2015, 2016, and 2017:

| TAX YEAR | # OF EMPLOYEES | COMPENSATION AMT |
|----------|----------------|------------------|
| 2017 | 8 EMPLOYEES | $126,233.86 |
| 2016 | 9 EMPLOYEES | $106,698.26 |
| 2015 | 9 EMPLOYEES | $78,873.68 |

IRS records show that Chan, Jin Ping and Chauling Yeung are three of the employees each year that receive the W-2s from Asian Star, leaving five or six employees working at the restaurant. As noted previously, surveillance has shown that approximately 11 people, are packed in a cargo van after the restaurant closes each night and driven to 5677 Earnings Drive, Columbus, OH. This would indicate that not all employees are being included in the payroll tax returns or Forms W-2 submitted to the IRS, in violation of Title 26 U.S.C. 7202, Willful Failure to Collect or Pay Over Employment Tax.

13

## TAX INFORMATION – JIN PING

20.     IRS records show that Jin has filed Form 1040 individual tax returns for the 2013 - 2017 tax years.  Below is a summary of the returns on file for Jin:

| Tax Year | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| W-2 Wages | $13,192.00 | $0.00 | $9,271.00 | $9,071.00 | $6,460.00 |
| Add: Schedule C Income | $0.00 | $11,162.00 | $0.00 | $0.00 | $0.00 |
| Add: Other Income | | $3,032.00 | $9,762.00 | $2,812.00 | $10,961.00 |
| Adjusted Gross Income | $13,192.00 | $14,194.00 | $19,033.00 | $11,883.00 | $17,421.00 |
| Less: Standard Deduction | $8,950.00 | $9,100.00 | $9,250.00 | $9,300.00 | $9,350.00 |
| Less: Exemptions | $7,800.00 | $7,900.00 | $8,000.00 | $8,100.00 | $8,100.00 |
| Equals: Taxable Income | $0.00 | $0.00 | $1,783.00 | $0.00 | $0.00 |
| Tax Due: | $0.00 | $0.00 | $179.00 | $0.00 | $0.00 |
| Health Care Tax | | | $244.00 | $0.00 | $0.00 |
| Total Tax | $0.00 | $0.00 | $423.00 | $0.00 | $0.00 |
| Fed Tax Withheld | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Add: Earned Income Credit | $89.00 | $3,305.00 | $3,154.00 | $3,086.00 | $2,202.00 |
| Equals Total Payments | $0.00 | $3,305.00 | $3,154.00 | $3,086.00 | $2,202.00 |
| Less Tax Due | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Equals Refund Due | $89.00 | $3,305.00 | $2,731.00 | $3,086.00 | $2,202.00 |
| Occupation | "Waiterss" | Cashier | Worker | Worker | Worker |

## TAX INFORMATION – CHAULING YEUNG

14

21.     According to IRS records, Chauling Yeung became the owner of the Asian Star Buffet on January 1, 2015 through Asian Star 88 LLC. Yueng takes a modest salary from the restaurant on a Form W-2.  As of January 16, 2019, Yueng had a balance of $77,092.78 in her Bank of America account ending in xx8154 with a mailing address of 5658 Matuka Drive.  The address listed on her self-prepared 2018 tax return is 5658 Matuka Drive, Columbus, OH.  Below is a summary of Yueng's individual income tax returns:

| Tax Year | *2013 | 2014 | *2015 | 2016 | *2017 | 2018 |
|---|---|---|---|---|---|---|
| W-2 Wages | | $17,329.00 | | $34,876.00 | | $69,888.00 |
| Add: Ordinary Dividends | | $0.00 | | $135.00 | | $767.00 |
| Add: Taxable Interest | | | | | | $4.00 |
| Add: Schedule C Income | | $0.00 | | $0.00 | | |
| Add Capital Gain (Loss) | | $0.00 | | $3,000.00 | | |
| Less: Adjustments | | | | | | $28,000.00 |
| Less: SE Tax | | $0.00 | | $0.00 | | |
| Adjusted Gross Income | $19,785.00 | $17,329.00 | $23,250.00 | $32,011.00 | $63,959.00 | $42,659.00 |
| Less: Standard Deduction | | $6,200.00 | | $13,013.00 | | $24,000.00 |
| Less: Exemptions | | $3,950.00 | | $12,150.00 | | |
| Equals: Taxable Income | | $7,179.00 | | $6,848.00 | $30,468.00 | $18,659.00 |
| Add SE Tax | | $0.00 | | $0.00 | | |
| Tax Due: | | $718.00 | | $683.00 | | |
| Child Care Credit | | | | $683.00 | | |
| Education Credit | | $718.00 | | $0.00 | | |
| Total Tax | | | | $0.00 | $2,009.00 | $1,793.00 |

15

|  |  |  |  |  |  |
|---|---|---|---|---|---|
| Fed Tax Withheld |  | $1,357.00 | $0.00 |  | $964.00 |
| Add: American Opportunity Credit |  | $1,000.00 |  |  |  |
| Add: Earned Income Credit |  | $0.00 | $1,593.00 |  |  |
| Add: Child Tax Credit |  |  | $1,000.00 |  |  |
| Refundable Credits |  |  |  |  | $2,738.00 |
| Equals Total Payments |  | $2,357.00 | $2,593.00 |  | $3,702.00 |
| Less Tax Due |  | $0.00 | $0.00 |  |  |
| Equals Refund Due | $3,287.00 | $2,357.00 | $350.00 | $2,593.00 | $2,009.00 | $3,702.00 |
| * From IRS Transcript Occupation: Chauling Yueng |  |  | Manager |  | Manager |
| Preparer: |  | Student Self | Self |  | Self |

## ASSET PURCHASES - YEUNG

22.     Records obtained from the U.S. Department of Housing and Urban Development (HUD) show that on or about February 27, 2015, Yueng purchased 5658 Matuka Drive for $68,000 in cash. Yueng listed her address on the HUD 1 Settlement Statement as 5677 Earnings Drive, Columbus, OH and the closing documents include Yeung's statement that she intended to occupy 5658 Matuka Drive as her primary residence.

23.     On December 30, 2015, Yeung purchased a 2013 BMW X3 SUV from The Toy Barn with $28,000 in cash. Approximately $13,300 of the $28,000 was in $100 bills, and the rest was in small bills. The vehicle registration as well as Yeung's driver's license lists her residence as 5658 Matuka Drive, Columbus, Ohio.  Yeung has been

observed driving this vehicle from the Asian Star Buffet as recently as 10/08/2019.

**NEW YORK REAL ESTATE TRANSACTIONS – CHAULING YEUNG AND YIK CHAN**

24. In addition to the BMW and 5658 Matuka Drive residence purchases in 2015, Yeung is associated with the purchase of two properties located in the Brooklyn area of New York during 2016 and 2017. The first property was a multi-family residence located at 43-32 160th Street, Flushing, NY purchased on or about March 13, 2017 for approximately $1.425 million. Several large deposits and wire transfers were made to Yueng's personal account and a joint account held by Yeung and Yik Miu Chan prior to Yeung's "down-payment" for 43-32 160th Street. A snapshot of the deposits is below:

| Date | Amount | Type | Payer | Payee | To Account: | Name on Account |
|------|--------|------|-------|-------|-------------|-----------------|
| 04/07/2016 | $48,813.80 | Official Check | Chauling Yueng | Chauling Yueng | xx6964 | Chauling Yueng |
| 04/12/2016 | $79,500.00 | Check | 82-25 Queens Mansion LLC | Chauling Yueng | xx6980 | Chauling Yueng Yik Mui Chan |
| 04/12/2016 | $40,000.00 | Official Check | N/A | Yik Mui Chan | xx6980 | Chauling Yueng Yik Mui Chan |
| 04/15/2016 | $49,941.92 | International Wire | Lin Feng Zhu | | xx6980 | Chauling Yueng Yik Mui Chan |
| 04/15/2016 | $49,941.92 | International Wire | Zheng Yuan Hua | | xx6980 | Chauling Yueng Yik Mui Chan |
| 04/15/2016 | $49,941.92 | International Wire | Qui Jin Xiang | | xx6964 | Chauling Yueng |
| 07/23/2016 | $20,000.00 | Check | Wei Min Cheng | | xx6980 | Chauling Yueng Yik Mui Chan |
| 09/23/2016 | $9,000.00 | Cash | | | xx6964 | Chauling Yueng |
| 09/27/2016 | $9,000.00 | Cash | | | xx6964 | Chauling Yueng |
| 09/29/2016 | $40,000.00 | Domestic Wire | King Cole Meridian LLC | | xx6964 | Chauling Yueng |
| 09/30/2016 | $20,000.00 | Official Check | Hiu Han Chan | | xx6964 | Chauling Yueng |
| 09/30/2016 | $20,000.00 | Official Check | Yu Chen | | xx6964 | Chauling Yueng |
| 11/28/2016 | $8,000.00 | Check | Yufang Lin | | xx6964 | Chauling Yueng |
| 11/28/2016 | $16,859.94 | Check | National Financial Services LLC | | xx6964 | Chauling Yueng |
| 01/27/2017 | $22,994.25 | Check | Shapiro, Dicaro & Barak LLC | | xx6964 | Chauling Yueng |
| Total | $483,993.75 | | | | | |

25. On or about September 23, 2016, Yueng withdrew $142,000.00 for an

17

official check from account xx6964 payable to The Law Offices of Geng and Zhang PLLC with a notation in the memo line of the check of "43-32 160th St. down-pmt." On or about March 13, 2017, a deed was recorded in Queens County for the purchase of 43-32 160th Street with the buyer listed as "43-32 160th Street LLC." Although the down payment purportedly came from Yueng, the deed is signed by a Li Rong Dong as the sole member of 43-32 160th Street LLC on the buyer's side.

26.     The second property appears to be a residence located at 3428 111th Street in Flushing, NY sold by the Estate of Elana Haynes. On or about January 30, 2017, Yueng purchased an official check from U.S. Bank for $457,114.00 payable to "Estate of Elana Haynes" using funds from the following accounts:

  a $240,965.00 from xx6980 (Yik Mui Chan and Chauling Yueng)

  b $127,348.00 from xx6964 (Chauling Yueng)

  c $88,801.00 from xx6956 (Asian Star Buffet Operating Account)

25.     On or about February 1, 2017, 3428 111th Street in Flushing, NY was sold for $910,000 by the Estate of Elana Haynes to HP L 1 LLC. The deed is signed by the buyer's representative named Yueng Bick.

## TAX INFORMATION - CHIO CHAN

27.     IRS records show that Chan has filed individual Form 1040 tax returns for the 2013 through 2016 years, and his primary source of income is wages from the Asian Star Buffet. Chan has not filed returns for 2017 and 2018. Below is a summary of Chan's Form 1040 tax returns on file with the IRS:

18

| Tax Year | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| W-2 Wages | $9,931.00 | $0.00 | $6,002.00 | $6,081.00 | Not Filed |
| Add:Schedule C Income | $0.00 | $10,169.00 | $0.00 | $0.00 | |
| Adjusted Gross Income | $9,931.00 | $10,169.00 | $6,002.00 | $6,081.00 | |
| Less: Standard Deduction | | $6,200.00 | $6,300.00 | $10,350.00 | |
| Less: Exemptions | | $3,950.00 | $4,000.00 | $0.00 | |
| Equals: Taxable Income | | $19.00 | $0.00 | $0.00 | |
| Tax Due: | | $2.00 | $0.00 | $0.00 | |
| Fed Tax Withheld | $663.00 | $220.00 | $0.00 | $0.00 | |
| Add: Earned Income Credit | $338.00 | $338.00 | $461.00 | $465.00 | |
| Less Tax Due | $0.00 | $2.00 | $0.00 | $0.00 | |
| Equals Refund Due | $1,001.00 | $556.00 | $461.00 | $465.00 | |
| Occupation Listed | Manager | Manager | "Woeker" | Manager | |

28. Chan's Ohio driver's license, which was last renewed in September 5, 2019, lists his residence as 2770 Brice Road, Reynoldsburg, OH, the same address as the Asian Star Buffet. Chan listed his residence as 5677 Earnings Drive, Columbus, OH on his 2013 and 2014 income tax returns. He used 2770 Brice Road, Reynoldsburg, OH for his address on his 2015 income tax return, and then used 5677 Earnings Drive, Columbus, OH again as his residence on his 2016 income tax return.

29. Chan has been a regular customer of the Sands Casino (The Sands) in Bethlehem, PA. According to records obtained from The Sands, Chan has gambled the

following amounts[1]:

| Year | Cash-Buy In Total | Credit Buy-In | Total Win/Loss |
|---|---|---|---|
| 2013 | $706,145.00 | $1,800.00 | $305,458.00 |
| 2014 | $2,297,977.00 | $598,000.00 | -$530,920.00 |
| 2015 | $710,050.00 | $708,000.00 | -$196,760.00 |
| 2016 | $1,265,386.00 | $1,852,400.00 | -$1,934,403.00 |
| 2017 | $480,500.00 | $2,183,800.00 | -$945,237.00 |
| 2018 | $126,505.00 | $12,327,000.00 | -$1,125,136.00 |
| 2019 | $1,107,060.00 | $7,647,000.00 | -$2,403,897.00 |
| Total | $6,693,623.00 | $25,318,000.00 | -$6,830,895.00 |

## SANDS CASINO HOTEL ROOMS

30.     Pennsylvania State Highway Patrol Sergeant Steve Yanchis is currently

assigned as the supervisor to the investigative unit at the Sands Casino in Bethlehem.

Yanchis has stated that Chan has been living at the Sands Casino for the past several

years.  Discussions with State Highway Patrolman Nick Mantione, who is currently

assigned to Yanchis, revealed that on or about January 11, 2019, he had a discussion

with the hotel manager on duty that Chan only stays in room numbers 911 or 913.  He

does not allow the hotel cleaning staff to clean his room, so the hotel has to move Chan

---

[1] "Cash-Buy In" refers to what Chan actually wagered in cash or chip buy-ins.  "Credit Buy-In" refers to when Chan taps his credit line at the casino to make a wager.  While it is impossible to know how much money in either of these categories is recycled money (i.e., money wagered previously and due to a win, used again to bet), the "Total Win/Loss" column is an accurate count of how much money Chan has physically lost over the years.

to the other room (911 or 913) approximately every other week in order for the staff to clean the room for sanitary reasons. Although Chan likes Rooms 911 and 913, Chan has been staying in other room numbers as of late depending on what the hotel has available.

### CHAN'S ACTIVITY AT THE SANDS CASINO

31. Surveillance footage obtained from The Sands shows Chan frequently meets with casino floor patrons who appear to have gambled all of their money. One instance recorded on January 27, 2018 shows an unidentified Asian male, purportedly acting as a 3rd party for an unknown Asian casino patron, make a phone call from his cell phone and begin to walk around the casino looking for someone. Chan then exits from the Asian restaurant in the casino called Chopstick while on his own cell phone and begins walking through the casino looking for someone. Chan finds the casino patron that the 3rd party was acting for and passes the patron $50,000 in casino chips. Chan then appears to record something in his phone after he passes the chips to the patron.

32. On April 19, 2018, surveillance recorded Chan taking a call on his cell phone while gambling on the casino floor. An unknown Asian male approaches Chan at the gaming table, and both men enter a one-person restroom at the same time. The door is left cracked, and surveillance can see Chan give the unknown male $50,000. The unknown male then signs a piece of white paper and gives it to Chan. Both men exit the restroom, and Chan places the piece of paper in his pocket.

33. Another surveillance recording on July 15, 2018 shows Chan withdrawing

21

$50,000 in cash from his front-money account at the cage and place the cash in a black, leather shoulder satchel that, according to Sands surveillance staff, Chan is rarely without. Chan then proceeds to withdraw $100,000 in markers and places it in his black bag and then leaves the casino grounds with all $150,000.

34.     Video surveillance of Chan on January 15, 2019 shows Chan gambling on the casino floor with a black leather bag. Chan finishes gambling and then proceeds to his room (913) with the black bag at approximately 12:40PM. He exits six minutes later with the black bag around his shoulder with an unknown Asian woman, and they both leave the casino property in what appears to be a ride-sharing vehicle. Both individuals returned to the casino at approximately 11:30PM.

35.     On January 18, 2019, at approximately 12:30PM, Chan was at a gaming table with an Asian female and appeared to receive a call on his cell phone. Chan and the woman left the table after the apparent phone call and walked from the gaming floor to the hotel. On their way into the hotel area, Chan and the female encountered an Asian male carrying two bags. One bag was a larger bag with the letters "DKNY" on the lower portion of the bag (a shopping bag). The other bag was a smaller gold colored bag. The unknown male placed both bags on the floor Chan then picked up the DKNY bag and proceeded to a hotel room on the 9th floor (presumably his room) along with the female. The unknown male proceeded towards the casino with the gold bag. Chan and the female were in the room for approximately 10 minutes. The female was carrying a large black bag. The two ultimately proceeded back to gaming floor. Both Chan and the female sat at a gaming table together and appeared to take some casino chips/casino cheques from the large black bag/purse.

22

36.    PSP Cpl. Mantione encountered an incident on January 11, 2019 in which an Asian female named Li Yun Lin was observed "bill stuffing" approximately $8,330 into various slot machines; "bill stuffing," a method of money laundering, refers to when a casino patron fills up a slot machine with cash but does not gamble and instead retrieves a ticket from the slot machine and then proceeds to the casino cage for a check from the casino for the amount of bills inserted into the machine.  Cpl. Mantione interviewed Lin and asked her what she did for a living and where she received the cash from.  Lin told Cpl. Mantione that she was a cleaner at New World Mall in Flushing, NY and makes approximately $17,000 a year.  Lin said approximately $1,000-2,000 of the cash was hers but the remainder was given to her from a friend named "Chong." Lin only knew Chong from taking bus trips with him.  Surveillance tape showed that Lin walked in with an Asian male named Huachong Lin (Huachong), and that he was still present on the casino floor.  Cpl. Mantione approached Huachong and stated he was with the State Police, and then Huachong ran away from Mantione.  Mantione apprehended Huachong and questioned him as to why he ran away.  Huachong stated he was in possession of 10 "free-play" cards and was scared that he was in violation of the one "free-play" card per patron rule.  During questioning, Huachong stated he is unemployed and that he comes to the casino 20 times per month.  Huachong said he redeemed $1,800 in slot vouchers on this visit, but he only had $300 on his person.  Huachong told Mantione he gave the rest of the money to other patrons whose free play cards he had.  Mantione noticed the address on Huachong's driver's license was the same as Lin's address and asked if they were married.  Huachong said they were not married.

23

37.     Subsequent surveillance review showed that Lin was recorded collecting players club cards from patrons on incoming bus lines while Huachong was present. During this same occasion, Huachong identified himself to hotel security as Lin's husband. Subsequent research by Mantione with casino staff revealed that on April 6, 2018, the couple stayed in a room paid for by Yik Chan, the current girlfriend/wife of Chio Chan.

## OTHER FINANCIAL INFORMATION – CHIO CHAN

38.     On October 31, 2014, Chan applied for a $100,000 line of credit with The Sands and listed his residence of five years as 34 Monroe Street, Apt. 008, New York, NY. He listed himself as the owner of a trading company for the past 12 years named An Xin at 5201 Flushing Ave., Maspeth, NY 11378. Contrary to the application for credit, Chan does not list any income from An Xin on his personal tax returns. In addition records obtained from Abacus Bank where Chan holds accounts show that Chan told the bank he makes approximately $225,000 per year. According to public record, An Xin is an importing/exporting company, but IRS records show that An Xin Inc. is a real estate property management company. The Forms 1120 tax returns for An Xin for the years 2013-2017 show that a Chinese national named Huang Ke is the 100% shareholder of An Xin.

39.     IRS records show that Yun Yan Pan is issued a Form W-2 from An Xin Inc. for the years 2012 through 2016. Pan was previously observed in 2013 and 2014 at the Sands Casino passing chips to Chan and his current wife Yik Chan as well as other Asian individuals. Pan also openly bragged to casino personnel that she was part of Chinese organized crime out of New York, NY and spent lavishly on cars and other

24

luxury items. Pan previously did 3 years in federal prison for extortion and kidnapping charges in 1998. One of the individuals the Chans and Pan were chip sharing with was a man by the name of Sun Jing Chen who operated several bus lines out of New York, NY that traveled to eastern Pennsylvania.

40.    An interview with Director of Credit at the Sands Casino in Bethlehem revealed that upon Chan's initial application for $100,000 in credit in October of 2014, he was only initially granted $15,000. Chan's credit limit has steadily gone up as his level of play and bank account balances have increased, and his current credit limit is $200,000. A yearly verification of Chan's personal bank account balance conducted by the casino's 3rd party vendor reveals the following average bank balances and current bank balances for the years 2014 - 2018:

| Date of Verification | Average Balance | Current Balance |
|---|---|---|
| 09/30/2014 | $10,000-25,000 | $50,000-75,000 |
| Apr-15 | $10,000-25,000 | $5,000-7,500 |
| 10/26/2016 | $50,000-75,000 | $50,000-75,000 |
| 11/01/2017 | $50,000-75,000 | $25,000-50,000 |
| 07/27/2018 | $75,000-99,000 | $100,000-250,000 |

41.    PSP Sgt. Yanchis's professional opinion based upon his experience, surveillance footage and Chan's level of game play is that Chan is currently involved in a loan sharking operation. Loan sharking is generally defined as loaning money at high interest rates to people in dire need of the money. Loan sharking is prevalent in the gambling industry in which gambling addicted players often borrow money from unlicensed sources in the hopes that a big gambling win will pay off the player's debts.

25

Typically when the player cannot pay off his/her debts, the "loan shark" will often use threats of violence or indentured servitude to collect on the debts. Coincidentally, an anonymous letter postmarked from New York, NY was sent to the Pennsylvania State Police in August of 2018 which states a loan sharking operation is being operated out of the Chopstick restaurant within the Sands Casino. The letter states the operation preys upon the Asian bus lines that travel to the Sands Casino. The writer alleges that workers within the restaurant identify compulsive gamblers and refer them to the individual running the loan sharking operation.

42.    Records obtained from Abacus Federal Savings show Chan's personal checking balance as of December 31, 2018 was $315,946. A review of deposits for the month of November 2018 show that Chan primarily deposited checks from other Asian individuals and companies for large, round dollar amounts. For example, there were $99,500 in deposits to Chan's personal bank account for the month of November 2018. On November 1, 2018, Chan deposited a personal check payable to him from Suzie Cao for $10,000 and a bank check from Angela Cao payable to Chan for $10,000. On November 7, 2018, Chan deposited a $30,000 bank check payable to him from Sao Tong Zheng. On November 13, 2018, Chan deposited a personal check from Jin Hong Yu in Brooklyn, NY payable to Chan for $10,000 and also a personal check from Li Na Lin payable to Chan for $4,000. Chan deposited a personal check for $10,000 payable to him from Doris L. Yuang on November 15, 2018. On November 26, 2018, Chan deposited a check payable to him from the China Sea Restaurant in Kissimmee, FL for $5,000 and a personal check payable to him for $10,500 from Feng Ping Zhou.

## MAINTENANCE OF RECORDS

26

43.    Based upon my training and experience, I know:

a   That individuals such as Chan, typically maintain records that detail income and expenses for several years;

b   That individuals maintain safes on the premises in which cash, receipts, and other records are often kept in the ordinary course of business;

c   That individuals often summarize information obtained from day to day business records into financial documents such as income and expense statements, gross receipts journals, expenditure journals, payroll journals, and general ledgers;

d   That individuals typically maintain records that detail income they earned from businesses they own, control, work for or direct, for several years;

e   That individuals maintain books and records at their home, business location, and/or the location from which they direct their business;

f   That it is common practice among individuals to maintain journals, bank records, and other financial records reflecting assets, liabilities, income and expenditures;

g   That by reviewing bank and business records, the flow of funds to or from an individual or business can be identified by tracing the "paper trail," which is created by entries into business records, bank account records, invoices, receipts, or other documents created to initiate and finalize transactions, as well as work-papers, schedules, ledgers, and journals used to record the results of financial transactions;

h   That records of individuals and businesses are used as a basis for the

27

preparation of individual, corporate, and business income tax returns;

i  That business records are ordinarily kept and maintained at an individual's home and place of business for extended periods of time, often several years;

j  In the current age, most records are typically kept on computer and that computers are likely to be on the premises;

k  That it is frequently impossible to directly prove the income of people who have engaged in a pattern of financially deceptive or unrecorded transactions.  In those cases, the Service must resort to a net worth or other indirect analysis.  To perform that analysis, it is necessary to have the records for a base year immediately preceding the first year in which suspect activities have been identified.

l  Personal video tapes, DVDs, and cassette recordings can provide income and lifestyle information that is pertinent to proving income.  In the past, such examples have included lavish vacation videos for persons claiming little income and recorded discussions of business transactions.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

44.    As described above and in Attachment D, this application seeks permission to search for records that might be found on the PREMISES, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive, cellular telephones or other storage media.  Thus, the warrant

28

applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

45. *Probable cause.* I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of

29

how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d   Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

46. *Forensic evidence.* As further described in Attachment D, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

a   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs

30

store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b   As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer

31

and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a

32

crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c   A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d   The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e   Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the

33

presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f   I know that when an individual uses a computer to submit false tax returns, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

47.   *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to

34

prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a  The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b  Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

48. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

49. Because several people work and/or live at the PREMISES, it is possible that the PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers, cellular telephones or storage media, the warrant applied for would permit the seizure and review of those items as well.

50. Asian Star Buffet ("the Company") is a functioning company that conducts legitimate business. The seizure of the Company's computers may limit the Company's ability to conduct its legitimate business. As with any search warrant, I expect that this warrant will be executed reasonably. Reasonable execution will likely involve

36

conducting an investigation on the scene of what computers, or storage media, must be seized or copied, and what computers or storage media need not be seized or copied. Where appropriate, officers will copy data, rather than physically seize computers, to reduce the extent of disruption. If employees of the Company so request, the agents will, to the extent practicable, attempt to provide the employees with copies of data that may be necessary or important to the continuing function of the Company's legitimate business. If, after inspecting the computers, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government will return it.

## CONCLUSION

51.    This casino activity conducted by Chan and his associates is indicative of Chan conducting business relative to a possible loan sharking operation. Chan and others are also likely involved in employing illegal aliens for financial gain and not reporting their true earnings to the IRS. In addition, the level of cash being spent by Chan and Chauling Yueng is not commensurate with someone who claims the amounts of income they claim on their personal tax returns.

52.    I submit that this affidavit supports probable cause for a warrant to search the PREMISES described in Attachments A, B and C and seize the items described in Attachment D.

Respectfully submitted,

David J. Gosiewski

37

Special Agent
IRS-CI

Subscribed and sworn to before me
on October 11, 2019:

_____
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT C

*Property to be searched*

5677 Earnings Drive, Columbus, OH 43232

The property located at 5677 Earnings Drive, Columbus, OH 43232 is a single family residence located on the south side of Earnings Drive.  The property has an attached two-car garage with one garage door.  The house has white-colored siding and the numbers "5677" are displayed on the mailbox in front of the house.

3

## ATTACHMENT D

*Property to be seized*

1.  All records relating to violations of 26 U.S.C. §§ 7201 – Attempt to Evade or Defeat the Assessment of Tax; 7206(1) – Subscribing to a False Tax Return; 7202 – Willful Failure to Collect or Pay Employment Tax; 7206(2) – Aiding or Assisting in the Preparation of a False Tax Return; as well as violations of 18 U.S.C. §§ 371 – Klein Conspiracy; 892 – Making extortionate extensions of credit; 1956(h) – Money Laundering Conspiracy; ~~1589 – Forced Labor; and 1590 Trafficking with respect to peonage, slavery, involuntary servitude, or forced labor~~ and, those violations involving Chio Chan, Yik Mui Chan, Chauling Yueng, Chunlin Wu, Jin Ping Chen, Asian Star of Reynoldsburg, Inc., Asian Star 88, LLC, Asian Star Buffet and occurring after January 1, 2013, including, but not limited to:

   a.  Records and information relating to federal and state income and payroll tax returns, state sales tax returns and amended tax returns and the evasion of any assessment or payment of taxes;

   b.  Records and information relating to books of account and other documents or papers relative to financial transactions of the principals;

   c.  Records and information relating to indicia of occupancy, residency, rental and/or ownership of the PREMISES described above or vehicles located thereon, including, but not limited to utility and telephone bills, canceled

4

envelopes, keys, deeds, purchase lease agreements, land contracts, titles, and vehicle registrations;

d. Records and information relating to employees Withholding Exemption Certificate (Form W 4); Wage and Tax Statements (Forms W 2) disclosing his/her annual wages; U.S. Information Returns (Forms 1099) disclosing fees, commissions, etc. paid; all background records including applications for employment, personnel files, credit checks, background investigations, etc.;

e. Records and information relating to the purchase of assets and other business and personal expenditures; real estate records; loan records; records relating to joint venture interests; records reflecting income; rolodexes; other records evidencing the receipt or disbursement of funds;

f. Records and information relating to corporate bookkeeping and other financial records including General Ledger, General Journals, all Subsidiary Ledgers and Journals, Gross Receipts and income records, Cash Receipts and Disbursement records and/or Journals, sales and Purchase records and/or Journals, Accounts Receivable and Payable Ledgers and records, Bad Debt records, Cost of Goods Sold records, Loan Receivable and Payable Ledgers, Voucher Register and all sales and expense invoices including all invoices documenting expenses paid

5

by cash (currency ) or bank check (cashier or teller checks) and retained copies of any bank checks (cashier or teller checks);

g. Records and information relating to inventory records establishing beginning and ending inventories including inventory sheets, work-papers, and valuation records. Records and work-papers reflecting the purchase, basis and depreciable life of assets. Records and work-papers of sales of corporate assets such records disclosing the dates of purchase and sale, cost and sales price, records establishing or adjusting asset basis;

h. Records and information relating to Corporate Minute Book, Stock Register or other records reflecting ownership of corporate stock. All financial statements, bookkeeper's and/or accountant's work papers used in the preparation of corporate records or tax returns. Retained copies of all federal and state income, payroll and excise tax returns;

i. Records and information relating to savings account records, including passbooks or bank statements, records reflecting dates and amounts of deposits, withdrawals, interest, debit and credit memos, deposit slips, records reflecting the identity of checks deposited, withdrawal slips, and records disclosing the disposition of withdrawals, Forms 1099, debit and credit memos. Records of any certificates of deposit, money market certificates, U.S. Treasury Notes or Bills purchased;

6

j. Records and information relating to checking account records, including bank statements, deposit slips, records revealing the identity of checks drawn on the account, checks deposited, all debit and credit memos, and Forms 1099 issued;

k. Records and information related to loan records, including applications, financial statements, loan collateral, credit and background investigations required, loan agreements, notes or mortgages, settlement sheets, contracts, retained copies of checks issued for loans, repayment records, including records revealing the date, amount and method of repayment (cash or check), checks used to repay loans and a record disclosing the total amount of discount or interest paid annually, records of any liens, loans correspondence files and internal memoranda relative to these loans, whether the loan is made to or by the targets identified in the affidavit;

l. Records and information relating to the employees of Asian Star Buffet, including citizenship status, employment records, personnel records, pay and benefits, relationship with the identified targets, their housing and transportation, etc.

m. Cash in excess of $5,000;

n. Passports, visas and travel documents

7

2.  The opening and search, and removal, if necessary, of any safe or locked receptacle or compartment, as some or all of the property heretofore may be maintained.

3.  For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

   a.  evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

   b.  evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

   c.  evidence of the lack of such malicious software;

8

d.  evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e.  evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.  evidence of the times the COMPUTER was used;

i.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.  records of or information about Internet Protocol addresses used by the COMPUTER;

l.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked"

9

or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m. contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.